**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Lyndon P Graves, Sr., | No. CV-19-02463-PHX-MTL |
| Plaintiff, | **ORDER** |
| v. | |
| David Bernhardt, et al., | |
| Defendants. | |

Before the Court are three motions. The first and second, filed by Defendants Secretary of the Interior David Bernhardt, Secretary of Agriculture Sonny Perdue, Vicki Christiansen, Amy DePestel, and the United States Department of the Interior (collectively the "Defendants") (Doc. 30), move for dismissal and for summary judgment. The third, filed by Plaintiff Lyndon P. Graves, Sr. (Doc. 44), moves for partial summary judgment.[1] For the reasons that follow, the Court grants Defendants' Motion to Dismiss in part (part of Doc. 30); grants Defendants' Motion for Summary Judgment (part of Doc. 30); and denies Plaintiffs' Motion for Partial Summary Judgment (Doc. 44).

**I.  BACKGROUND**

The United States Forest Service (the "Forest Service"), a division of the Department of Agriculture, exercises administrative supervision over the Tonto National

---

[1] Defendants' motion is fully briefed. Defendants filed a response to Graves's motion for partial summary judgment, however, Graves did not file a reply brief and the time for doing so has passed.

Forest. The Bureau of Land Management ("BLM"), a division of the United States Department of the Interior, administers mining claims[2] on public land, including the claims at issue in this case.

Mr. Graves asserts an interest in two mining claims in the Tonto National Forest: Spanish Queen # 2 and Spanish Queen # 3 (collectively the "Spanish Queen Claims" or the "Claims").[3] Mr. Graves contends that, on or about February 4, 2010, he discovered gold deposits on the Spanish Queen Claims. On February 4, 2010, Mr. Graves obtained a report from a spectrographer indicating the presence of gold and silver in samples provided from the Claims. Mr. Graves physically posted and dated a notice at the Claim sites on March 24, 2011. *See* 43 C.F.R. § 3832.11(c)(3).

On July 2, 2015, Mr. Graves submitted to the Forest Service an initial notice of intent to conduct mining activity on the Spanish Queen Claims. The notice of intent described proposed activity as consisting of one to four persons working on the Claim at any given time with two overhead cable systems for transporting raw ore to a nearby unimproved parking area. Dump trucks would then remove the ore. Due to the nature of the proposed on-site activity, on July 14, 2015, a Forest Service administrator in Globe, Arizona, sent an email to Mr. Graves requesting that he submit a formal plan of operations. The administrator offered an in-person meeting and to visit the site in order to "work through [Mr. Graves's] proposal." (Doc. 31-1 at 40.) Presumably, as a result of this exchange of information, Mr. Graves provided a new notice of intent on July 27, 2015; however, according to Forest Service officials, it still lacked required detail. Mr. Graves exchanged additional emails with Forest Service officials providing additional information about his operational proposal.

Forest Service officials sought further clarification from Mr. Graves by email on

---

[2] A mining claim is "[a] parcel of land that contains precious metal in its soil or rock and that is appropriated by a person according to established rules and customs known as the process of *location*." Mining Claim, BLACK'S LAW DICTIONARY (11th ed. 2019). Put differently, it is a parcel that a prospector has appropriated to search for minerals, made the requisite improvements upon, and applied for BLM to convey to the prospector. *See United States v. Shumway*, 199 F.3d 1093, 1099 (9th Cir. 1999).

[3] Mr. Graves has another mining claim, Spanish Queen # 1, which is not at issue in this case.

- 2 -

August 12, 2015. Mr. Graves was invited to a meeting to review the status of his proposal and answer additional questions. The Forest Service states that it did not hear from Mr. Graves again until later in 2017, after he directly contacted the White House for assistance developing his gold deposit claims.

As a result of Mr. Graves's contact with the White House, an official with the United States Department of Agriculture in Washington, D.C., exchanged a series of letters with Mr. Graves to offer his assistance with the Spanish Queen Claims. In a letter dated February 6, 2018, the official explained to Mr. Graves that, "based on the activities [he] proposed in 2015, [he would] need to remain involved with the Forest Service and the regulations to move [his] proposal forward." (Doc. 31-1 at 36.) The letter further said that, "[t]he level of surface disturbance [that his] activities will probably cause will determine the type of documents [he] will have to file with the Tonto National Forest." (*Id.*) The letter also indicated that a plan of operations would be necessary if his proposed activities "are likely to cause a significant disturbance of surface resources." (*Id.*) The letter encouraged Mr. Graves to contact the Phoenix-based Tonto National Forest mineral manager "to discuss [his] plans and activity levels." (*Id.*)

A prior letter, dated November 14, 2017, addressed another issue that was previously flagged by the Arizona-based Forest Service staff. The Department of Agriculture official noted that Mr. Graves's proposed mining activity would be conducted in areas that have been withdrawn from public entry for mineral exploration and extraction. The letter stated, "you have rights to access, explore, and develop only those portions of your claims that are outside the withdrawal boundary." The letter attached the master title plat for the area withdrawn from mineral exploration, which includes the Spanish Queen claim sites.

In February and March 2018, Mr. Graves engaged in a telephonic and email conversation with the mineral manager to discuss his plan to explore the Claims. Mr. Graves provided a revised notice of intent that included a description of ground-penetrating radar surveys proposed for two separate parts of the Spanish Queen Claims.

On March 23, 2018, an official with the Forest Service notified Mr. Graves as follows:

> Your proposal does not require digging or removal of vegetation; therefore, pursuant to 36 C.F.R. 228.4(a), I have determined that significant surface disturbance is not anticipated to result from your proposed activities as described. I acknowledge your [notice of intent] and no plan of operations or reclamation performance bond are required for these mining related activities.

(Doc. 33-1 at 47.)

Then, on May 26, 2018, Mr. Graves sent an email to the Forest Service official proposing a change of plans. He indicated that he "had additional thoughts about the development of the claims" and now wanted to dig a test hole with either a pick and shovel or a motorized auger. (Doc. 31-1 at 51.) The Forest Service official responded to Mr. Graves on the next day, indicating once again that, "[w]hat [he] want[s] to do is a surface disturbance and ultimately will require a plan of operations with a bond (per 36 CFR 228.4) and we will have to do some form of NEPA."[4] (Doc. 31-1 at 50.) Mr. Graves submitted his proposed plan of operations on June 27, 2018.

The NEPA review confirmed that parts of Mr. Graves's Spanish Queen Claims are within an area that the federal government had long ago withdrawn from mineral entry. (Doc. 31-2 at 32-36.) On September 4, 2018, a Forest Service official advised Mr. Graves of this discovery and told him that, based on the withdrawal, they could no longer proceed with his proposed plan of operations. Mr. Graves was advised to consult with "a professional lands person to get an opinion on the boundaries of the valid portions of [his] claim so that [he] can appropriately work that in the future." (*Id*. at 5.) A follow-up letter was sent by the Forest Service to Mr. Graves on September 26, 2018. The letter told Mr. Graves that he had the option "to relocate [his] proposed operations outside of the withdrawn area" and that the Forest Service "will continue to process [his] plan according to our regulations." The letter recommended that he "consult[] a professional land [person] or mining attorney regarding the location and boundaries of [his] claim(s),

---
[4] The National Environmental Policy Act ("NEPA") generally requires an environmental impact study.

as any portion of [his] claim within a withdrawn area would be void *ab initio*." (*Id*. at 8.)

In the course of the NEPA review and inquiry over the areas that were withdrawn from mineral entry, on or about September 20, 2018, Defendant DePestel, a BLM employee, reviewed Mr. Graves's file. This review included Mr. Graves's notices of claim for Spanish Queen Claims that were filed with BLM's Phoenix, Arizona office on June 21, 2011. The law requires that a separate document, a notice of certificate of location, be submitted to the local BLM office within 90 days after the claim is located. *See* 43 U.S.C. § 1744(b); 43 C.F.R. § 3833.11(a) ("You must record in the proper BLM State Office a copy of the notice or certificate of location that you recorded or will record in the local recording office by the 90th day after the date of location."). Pursuant to this regulation, Mr. Graves located his claims on March 24, 2011 when he posted his notice of location on the claim sites. *See* 43 C.F.R. § 3832.11. Based on the date of location, he was required to file a notice of certificate of location with BLM no later than June 22, 2011.

Mr. Graves submitted the notice of location for the Claims by fax transmission from an office supply store in Las Vegas, Nevada. The fax transmission cover sheet bears Graves's handwritten date "6/21/2011" and the note "PLEASE GET THESE LOGGED IN FOR <u>TODAY</u>! TIME IS RIGHT AT 90 DAYS THANK YOU!" Mr. Graves included his credit card number in the notation for payment of fees associated with his Claims. The BLM-applied receipt stamps on the fax cover sheet and the notices of location all indicate that BLM received the documents on June 24, 2011. BLM also processed Mr. Graves's credit card transaction on June 24, 2011.

Defendant DePestel analyzed Mr. Graves's file, including the fax transmittal sheet, the notices, the handwritten instructions, the BLM date stamps, and the credit card transaction detail. She noticed that there was no machine-generated fax transmission information on the cover sheet or on any of the faxed documents. She queried whether June 21, 2011, fell on a Friday, "thinking the document possibly arrive[d] late in the afternoon on a Friday and was not stamped until Monday." (Doc. 32-1 at 32.) That day,

the 21st, however, was a Tuesday. Based on the information that she did have – the BLM date stamps and the credit card transaction detail – she concluded that the notices were filed on June 24, 2011, which is the 92nd day and, under 43 C.F.R. § 3833.11(a), two days late. The legal penalty for an untimely notice is that the claims are deemed forfeited. *See* 43 U.S.C. § 1744(c); 43 C.F.R. § 3833.1(a). Accordingly, on November 5, 2018, BLM notified Mr. Graves in writing that his Claims had been forfeited due to the untimely filing of the notices of certificate of location.

## II. PROCEDURAL HISTORY

The November 5, 2018 BLM decision, declaring that the untimely notices of location of claim resulted in forfeiture of the Spanish Queen Claims, was a final agency decision under the Administrative Procedure Act ("APA"). Mr. Graves filed a timely appeal of the BLM's decision with the Interior Board of Land Appeals ("IBLA"). On March 14, 2019, IBLA issued its decision affirming the BLM's action that declared the Claims forfeited. *Lyndon P. Graves, Sr.* 194 IBLA 118 (2019).

On April 14, 2019, Mr. Graves initiated the instant action in this Court. On May 6, 2019, Mr. Graves filed an Amended Complaint and Request for Injunction (the "Amended Complaint") that asserts five causes of action. The first cause of action alleges that all of the Defendants conspired to prevent him "from exercising his legal rights to explore and mine on public lands." (Doc. 9 at 12.) The second cause of action is an administrative appeal from the BLM's decision that Mr. Graves's Claims were forfeited. (*Id*. at 12-13.) The third cause of action is an administrative appeal from IBLA's decision. (*Id*. at 13.) The fourth cause of action is a claim against the Forest Service for its position concerning the lands withdrawn from mineral entry.[5] (*Id*.)

Mr. Graves generally asserts that this Court has jurisdiction under the APA, 5 U.S.C. § 702, the Civil Rights Act, 48 U.S.C. § 1983, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202. On November 22, 2019, this Court held oral argument on

---

[5] The Amended Complaint asserted a fifth claim against the Congress of the United States for "the issuance of a moratorium on the patenting of lawful mining claims." (Doc. 9 at 14.) The Court dismissed this claim "because members of Congress acting within their legislative capacity enjoy legislative immunity from civil suits." (Doc. 10.)

- 6 -

Defendants' Motion to Dismiss and the parties' cross motions for summary judgment.

On November 27, 2019, at the Court's request, Defendants filed a Notice to the Court Regarding Availability of Claims (Doc. 54) stating that, "as of November 22, 2019, [BLM] has not received any new mining claims for recordation on [the Spanish Queen Claims]."

**III. ANALYSIS**

    **A. Judicial Review of Final Agency Action**

The APA provides that a person aggrieved by a final agency action may seek judicial review in the district court. 5 U.S.C § 702. The Court construes Mr. Graves's first, second, and third causes of action as appeals of final agency decisions under § 702. *See Alto v. Black*, 738 F.3d 1111, 1117 (9th Cir. 2013) ("Although only the third claim is explicitly denominated as an APA claim in the complaint, the first three claims all involve challenges to the propriety of the BIA's decision. All three claims may therefore be fairly characterized as claims for judicial review of agency action under the APA."). Under the applicable standard of review, this Court will reverse an agency action that was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A); *accord Center for Biological Diversity v. Ilano*, 928 F.3d 774, 779-80 (9th Cir. 2019). This standard is "highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its decision." *Bahr v. U.S. Envtl. Prot. Agency*, 836 F.3d 1218, 1229 (9th Cir. 2016) (quoting *Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't of Agric.*, 499 F.3d 1108, 1115 (9th Cir. 2007)).[6] After a thorough review of the administrative record (Doc. 32), this Court affirms the IBLA decision.

Mr. Graves premises his legal claims on the General Mining Law of 1872 (the "GML"). Congress enacted the GML "to reward and encourage the discovery of minerals that are valuable in an economic sense" on federal lands. *United States v. Coleman*, 390

---

[6] *See also Am. Radio Relay League, Inc. v. Fed. Communications Comm'n*, 524 F.3d 227, 248 (D.C. Cir. 2008) (Kavanaugh, J., concurring in part and dissenting in part) ("Courts of course must be vigilant in ensuring that agencies adhere to the plain text of statutes imposing substantive and procedural obligations.").

U.S. 599, 602 (1968); *see also* 30 U.S.C. § 22 ("[A]ll valuable mineral deposits in lands belonging to the United States, both surveyed and unsurveyed, shall be free and open to exploration and purchase."). Congress intended that the GML provide the public with broad access to mineral exploration and extraction on public lands. Some of the land that was initially reserved was later withdrawn and is therefore no longer available for mineral entry. Since the GML's enactment, moreover, Congress has enacted other federal laws that impose regulations on this activity. *See United States v. Locke*, 471 U.S. 84, 86-87 (1985) (providing a historical overview of mining activity following the enactment of the GML). One such law is Section 314(b) of the Federal Land Policy Management Act of 1976 ("FLPMA"), which requires that a person who locates a mining claim:

> within ninety days after the date of location of such claim, file in the office of the Bureau designated by the Secretary [of the Interior] a copy of the official record notice of location or certificate of location, including a description of the location of the mining claim . . . sufficient to locate the claimed lands on the ground.

43 U.S.C. § 1744(b).

A claimant's failure to record a mining claim with BLM within this 90-day filing window results in the claim being "abandoned and void by operation of law." 43 C.F.R. § 3833.1(a); *accord* 43 U.S.C. § 1744(c) ("The failure to file such instruments as required by subsections (a) and (b) of this section shall be deemed conclusively to constitute an abandonment of the mining claim or mill or tunnel site by the owner . . . .").[7] Here, because Mr. Graves located his mining claims on March 24, 2011, the deadline to file his notices of location of claims was June 22, 2011. The notices of location of mining claims for the Spanish Queen Claims were required to be filed in BLM's Phoenix office. The principal dispute in this case arises over whether BLM's Phoenix office received the notices within the required 90-day time period under Section 314(b) of the FLPMA.

Mr. Graves contends that he faxed his notices of claims from an office supply

---

[7] See also *Locke*, 471 U.S. 84, 100, where the Supreme Court upheld as constitutional the Section 314(b) forfeiture provision attached to a mining claim's annual filing requirement. The Supreme Court upheld a forfeiture determination because the mining claim owner was one day late filing the annual report. *Id*. at 110.

- 8 -

store in Las Vegas, Nevada, on June 21, 2011, within the 90-day filing window. As support for this position, he points to the fax cover sheet on which he handwrote the date of the fax as June 21, 2011. But according to the BLM records, the notices were not received until June 24, 2011, which is outside of the required 90-day time period. BLM, therefore, determined that Graves forfeited his claims to the Spanish Queen Claims per Section 314(c) of the FLPMA and 43 C.F.R. § 3833.1(a). The BLM records consist of the BLM date and time stamps on the fax cover sheet itself and the accompanying notice of claims that read "2011 Jun 24." Additionally, the credit card transaction report for the processing, location, and initial maintenance fees paid by Mr. Graves in relation to the notices indicated that he was charged on June 24, 2011. *See* 43 C.F.R. § 3833.11(c). According to the date and time stamps and the credit card processing report, Mr. Graves's notices were two days past the 90-day submission deadline. Considering all the evidence, BLM issued a notice of claim forfeiture.

Mr. Graves appealed the BLM determination to IBLA. The evidence before IBLA consisted of (1) the fax cover sheet with Mr. Graves's handwritten notations, including the date "6/21/2011"; (2) the time and date stamp applied by BLA on the fax cover sheet; (3) the time and date stamps applied by BLA on the two location notices; and (4) the credit card transaction report. In examining the fax cover sheet and the handwritten date, IBLA explained that, "[w]hile this indicates that Graves intended to fax the cover sheet, and accompanying location notices, on June 21, 2011, there are no corresponding FAX duplicates, transmission logs, or other evidence in BLM files showing that the cover sheet or location notices were actually transmitted to BLM by FAX on that date." *Graves, Sr.*, 194 IBLA at 119. Moreover, as the IBLA decision points out, the fax cover sheet "[does] not demonstrate BLM's *receipt* of the location notices on or before the June 22, 2011[] due date, as required for filing or recording." *Id*. at 123. "[L]ike the location notices, the cover sheet bears a BLM date stamp of June 24, 2011, with a 10:08 a.m. time-stamp, which was the same time-stamp on one of the location notices, and one minute before the time-stamp on the other location notice." *Id*. at 119-120.

After conducting a thorough review of the evidence and the applicable statutory and regulatory provisions, IBLA concluded that Mr. Graves filed his notices after the June 22, 2011 due date. *Id.* at 124. IBLA identified the applicable authority concerning the 90-day filing deadline as Section 314(b) of the FLPMA and 43 C.F.R. § 3833.11(a). *Id.* at 123. IBLA also identified that, "[t]he implementing regulation states that *Recording* means the act of filing a notice or certificate of location with . . . BLM, as required by FLPMA." *Id.* at 123 (quoting 43 C.F.R. § 3830.5). Moreover, as it applies to Mr. Graves's fax transmission, "[*f*]*iled* means a document is . . . [r]ecieved by BLM on or before the due date . . . ." *Id.* (quoting 43 C.F.R. § 3830.5).

This Court agrees with IBLA's evidentiary analysis and legal conclusion that Mr. Graves failed to file his notice of location of claims within the required 90-day time period. Even accepting as true that the fax cover sheet's handwritten notations were made on June 21, 2011, and that the notices of location of claims were delivered to the office supply store on that date for fax transmission to BLM, there is no evidence that the notices were actually transmitted to BLM or received by BLM on that date. On the contrary, the only evidence of when BLM received the notices, which consists of the BLM-date-stamped documents and the credit card transaction reports, all indicate that filing was affected on June 24, 2011. This was after the 90-day filing window closed. Moreover, the record does not indicate that BLM deviated from its established intake and processing procedures for notices of location of claims and fee payment transactions. *See Wilson v. Hodel*, 758 F.2d 1369, 1372 (10th Cir. 1985) (BLM's established procedures for transmitting files is entitled to the presumption of administrative regularity). BLM and IBLA correctly concluded that Mr. Graves's failure to timely file resulted in a forfeiture of his claims.

IBLA's written decision also determined that Mr. Graves "offer[ed], and we find, no evidence that BLM conspired with the Forest Service or otherwise acted out of spite in declaring the Claims forfeited." *Graves, Sr.*, 194 IBLA at 124. IBLA was correct. There is no evidence of spite, ill-will, or other conspiratorial behavior on the part of the Forest

Service or BLM officials directed at Mr. Graves. To the contrary, the record in this matter is saturated with evidence that each government official who interacted with Mr. Graves concerning the Spanish Queen Claims behaved professionally and made every conceivable effort to explain the applicable rules and regulations for mineral exploration and extraction. They consistently offered him feedback on his plans and offered in-person meetings to help him along. Where appropriate, the officials even advised him to seek the assistance of private-sector experts and attorneys who could provide him with additional expert analysis and counsel. To the extent that many years went by before BLM discovered the forfeiture, that passage of time is largely attributable to Mr. Graves's prioritizing his other projects ahead of the Spanish Queen Claims.

For these reasons, the Court finds that the IBLA decision is not arbitrary, capricious, or an abuse of discretion. IBLA's decision on forfeiture of the claims is affirmed. Defendants' Motion for Summary Judgment (Part of Doc. 30) is granted with respect to the APA claims.

### B. Relief Under the Civil Rights Act

In the jurisdiction and venue section of the Amended Complaint, Mr. Graves mentions the Civil Rights Act, 42 U.S.C. § 1983. (Doc. 9 at 10.) Section 1983 establishes a private cause of action against any "person who, under color of any statute . . . of any State . . . , subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the depravation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U.S.C. § 1983. As the Defendants correctly point out in their Motion (Doc. 30), this remedial statute does not apply to federal officials acting pursuant to federal law. *See Ibrahim v. Dep't of Homeland Security*, 538 F.3d 1250, 1257 (9th Cir. 2013). All of the individual defendants named in this action are federal officials to whom § 1983 does not apply. Additionally, the Amended Complaint does not actually allege a claim for relief under the Civil Rights Act. The statute is simply mentioned at the beginning of the Amended Complaint.

The also Court finds that, because none of the defendants in this case are state

actors, an amendment to the Complaint would be futile. *See Gordon v. City of Oakland*, 627 F.3d 1092, 1094 (9th Cir. 2010) ("Although leave to amend a deficient complaint shall be freely given when justice so requires . . . leave may be denied if amendment of the complaint would be futile."). For these reasons, Defendants' Motion to Dismiss any potential § 1983 claims under Rule 12(b)(6), Federal Rules of Civil Procedure, is granted with prejudice.[8]

### C. Claims Against the Forest Service

Mr. Graves's Fourth Cause of Action alleges that the Forest Service committed error when it advised him that certain areas within his mining claims were withdrawn from mineral entry. (Doc. 9 at 13.) With respect to this claim, Defendants move for summary judgment under the ripeness doctrine and for failure to exhaust administrative remedies. (Doc. 30 at 10.)

The Court has concluded that the forfeiture of his interests in the Spanish Queen Claims divests Mr. Graves of any rights to mineral exploration on the land. Because Mr. Graves no longer has such an interest, the issue of whether the partial withdrawal of the Spanish Queen Claims was lawful is now moot. *Cf. Forest Guardians v. United States Forest Service*, 329 F.3d 1089, 1096 (9th Cir. 2003). Even if the Court were to find that the Forest Service acted unlawfully, that decision would not entitle Mr. Graves to pursue mineral exploration because he no longer has a valid land claim.

On the merits of the Motion for Summary Judgment, however, Defendants' position is that the Forest Service did not issue a final decision and, even if it had done so, Mr. Graves failed to pursue an administrative appeal within 45 days. *See* 36 C.F.R. § 214.9. After Mr. Graves was notified that parts of his Claims were withdrawn from mineral entry, Defendants argue that "the Forest Service offered to work with Plaintiff to find a path forward, to include identifying an alternative location, but Plaintiff stopped cooperating with the Forest Service." (Doc. 30 at 11.) To that end, on March 21, 2019, Mr. Graves left a voice message for a Phoenix-based Forest Service official, and, later in

---
[8] Given this outcome, the Court need not rule on that portion of Defendants' Motion to Dismiss that seeks dismissal for lack of subject matter jurisdiction.

the day, that official sent an email to Mr. Graves stating that the Forest Service's action "was not a decision, merely [its] informing [Mr. Graves] that the site could not have mineral operations on it." (Doc. 30 at 8.) The email did not include a written notice that the decision was or was not subject to appeal. *See* 36 C.F.R. § 214.6(a) & (c) (notices of appealability of final Forest Service decisions); *see also* 36 C.F.R. § 214.4(b) (decisions that are appealable; minerals). If the decision was subject to an appeal, the email did not include instructions on how to effectuate an appeal. 36 C.F.R. § 214.6(b). This email was the last interaction that occurred between Mr. Graves and Forest Service officials until this lawsuit was filed.

The Court finds that the March 21, 2019 email was not a final agency decision. This is because the Forest Service official offered to continue working with Mr. Graves on his plan of operations and the email communication did not include the required appealability notice and instruction. The claim against the Forest Service, therefore, has not yet ripened.

Even if the March 21, 2019 email constitutes a final agency decision, Mr. Graves would have failed to exhaust his administrative remedies. In matters involving the Forest Service, an aggrieved party must file an appeal "with the Appeal Deciding Officer within 45 days of the date of the decision." 36 C.F.R. § 214.9(a). An "Appeal Deciding Officer" is "[t]he Forest Service line officer who is one organizational level above the Responsible Official or the respective Deputy Forest Supervisor, Deputy Regional Forester, or Associate Deputy Chief with the delegation of authority relevant to the provisions of this part." 36 C.F.R. § 214.2. Mr. Graves failed to pursue an appeal within the Forest Service's administrative process. Mr. Graves argues that he did exhaust his administrative remedies because he presented the withdrawal issue to IBLA. (Doc. 42 at 4.) Administrative appeals from Forest Service decisions are not taken through IBLA; they are, instead, presented to an Appeal Deciding Officer at the Forest Service.

For these reasons, Defendants' Motion for Summary Judgment on the Fourth

Cause of Action is granted.[9]

## IV. CONTINUED AVAILABILITY OF SPANISH QUEEN CLAIMS

At oral argument, Defendants' counsel indicated that the Spanish Queen Claims deemed forfeited by BLM may still be available to Mr. Graves, should he choose to reassert his interest under applicable statutory and regulatory authority. At the Court's request, Defendants' counsel confirmed that both claims are still available. (Doc. 54.)

As a practical matter, it appears to the Court that Mr. Graves can simply re-locate his claims and file a timely notice of location with BLM. Taking these steps should obviate the need for continued litigation over whether the notices of location of claim were timely received by BLM on June 21, 2011, or untimely received on June 24, 2011. Should he successfully reassert his rights through the BLM process, Mr. Graves can continue to work with Forest Service officials on his plan of operations. In the event of an impasse, Mr. Graves can obtain a final decision and pursue all available administrative and judicial remedies.

## V. CONCLUSION

Accordingly,

**IT IS ORDERED** granting Defendants' Rule 12(b)(6) Motion to Dismiss (part of Doc. 30) the Amended Complaint on any potential § 1983 claim with prejudice;[10]

**IT IS FURTHER ORDERED** granting Defendants' Rule 12(b)(6) Motion to Dismiss (part of Doc. 30) the Amended Complaint's Fourth Cause of Action as unexhausted without prejudice;

**IT IS FURTHER ORDERED** granting Defendants' Motion for Summary Judgment (part of Doc. 30) on all other outstanding claims;

///

---

[9] Defendants also argue that "location of mining claims and determinations of claim validity are administered by the Secretary of the Interior, through the BLM, even on [Forest Service] lands." (Doc. 30 at 11.) The Court need not determine whether Mr. Graves should have included this point of contention with his IBLA appeal, as it disposes this claim on other grounds.

[10] The fifth claim for relief was previously dismissed. (Doc. 10.)

**IT IS FURTHER ORDERED** denying Mr. Graves's Motion for Partial Summary Judgment (Doc. 44);

**IT IS FURTHER ORDERED** denying as moot Mr. Graves's Motion for Stay (Doc. 55).

**IT IS FINALLY ORDERED** that the Clerk of the Court shall enter judgment in favor of Defendants and against Plaintiff as set forth herein.

Dated this 10th day of December, 2019.

*Michael T. Liburdi*
Michael T. Liburdi
United States District Judge